UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR01-52 RSM |
| Plaintiff, | |
| v. | PROPOSED FINDINGS OF FACT FOLLOWING AN EVIDENTIARY HEARING AND DETERMINATION AS TO ALLEGED VIOLATIONS OF SUPERVISED RELEASE |
| JEROME KEITH VASSAR, | |
| Defendant. | |

## INTRODUCTION

I conducted an evidentiary hearing on alleged violations of supervised release in this case on May 20, 2005. The United States was represented by Lawrence Lincoln for Janet Freeman. The defendant was represented by Robert Goldsmith. The proceedings were recorded on disk.

## CONVICTION AND SENTENCE

Defendant had been convicted of Bank Fraud; Fraudulent Use of Another's Identification on or about June 29, 2001. The Hon. Barbara J. Rothstein of this Court sentenced Defendant to 37 months of confinement, followed by 5 years of supervised release.

The conditions of supervised release included requirements that Defendant comply with the standard 13 conditions.

## ALLEGATIONS

USPO Michael K. Banks alleged that the defendant violated the conditions of supervised release in three respects:

PROPOSED FINDINGS
PAGE -1-

(1)     Assaulting Kenya Bostic and Jerrel Johnson on April 14, 2005, in violation of the general condition that he not violate any federal, state or local laws;

(2)     Failing to pay restitution as directed in January 2005, February 2005, March 2005, and April 2005, in violation of the general condition requiring him to make restitution as directed; and

(3)     Associating with Charles Robinson, a known felon, on April 14, 2005, in violation of standard condition #9, prohibiting him with associating with any person convicted of a felony without the permission of his probation officer.

At an initial hearing, I advised the defendant of these charges and of his constitutional rights.

SUMMARY OF EVIDENCE PRESENTED

At the evidentiary hearing, the Government presented four witnesses, USPO Michael Banks, Renton Police Officer Brad Martin, Kenya Bostic, alleged victim and Melanie Malzhan, a neighbor.  The defendant testified, as did one witness Charles Robinson.

The Government's first witness, U. S. Probation Officer Michael Banks, testified to having submitted reports of alleged violations and that the contents of his reports were true and correct. The Defendant was convicted of Bank Fraud along with Charles Robinson, served 37 months in custody and ordered to pay restitution in the amount of $142,000.   His release from prison was January 6, 2005, though he had been placed in a half-way house since August, 2004.  All the conditions of the Judgment were reviewed with him and Vassar signed the restitution agreement in August, 2004.  Exhibits No. 1 and  2 were admitted to corroborate this testimony.  A report illustrating Vassar's payment history was admitted.  Exhibit No. 3.

At this August interview, USPO Banks learned that the Defendant possessed a vehicle, a Grand Am, approximately 6 years old.  Vassar explained it was purchased with funds from a sale of a house, Roland Blair's home, which was sold for a sum of $225,000.

Concerning violation number one, USPO Banks testified that he obtained a copy of a Renton police report which alleged that Vassar was identified as having assaulted Kenya Dawn

PROPOSED FINDINGS
PAGE -2-

Bostic and Jerrel L. Johnson, a child the two have in common.  He also had reviewed a citation issued upon booking Vassar into the jail which pertained to both alleged victims. Exhibits No. 5 and 6 were admitted corroborating this testimony.

Concerning violation three, Vassar's association with Charles Robinson, USPO Banks explained he learned of this by reading the police reports, which listed Robinson as a witness to the assaults.  To confirm that neither Robinson nor Vassar were to associate, USPO Banks conferred with USPO Monique Neal, Robinson's probation officer.  She confirmed this prohibition was also placed upon Robinson.  On cross-examination, USPO Banks gave Vassar's explanation of his contact with Robinson as coincidental and that Robinson had asked for a ride back to the halfway house downtown.  Banks confirmed that he was not given advance notice by Vassar of his intent to see Robinson.

Also on cross-examination, by way of explaining the house sale proceeds, Vassar also told USPO Banks that the proceeds were not in any bank and that he took the proceeds and gave them to two others and had no more money.

The Government's second witness, Brad Martin, a Renton Police Officer testified that he was on duty as a patrolman when, via a 911 call, he was summoned to the scene of a domestic violence incident, after which he issued Vassar two citations of assault.  The citations reflect the birth dates of both Kenya Bostic and Jerrel Johnson as July 19, 1974 and December 9, 1992, respectively.  He also went to a different location which was the scene of a traffic collision.  There he saw a one car collision and two people standing next to the car. He identified Vassar as the driver with Robinson as the passenger.  He took statements from Vassar, found in Exhibit No. 5, which describe the confrontation at the residence and Bostic's subsequent car chase after him.  Officer Martin also took a statement from Robinson who said he did not see the confrontation between Bostic and Vassar but he did say he physically stood in between them.  He also said Bostic followed him in her car.

Martin also spoke with Bostic and with Jerrel Johnson.  Bostic explained to Officer Martin the following: 1) that when Vassar arrived to pick up Johnson she asked for a ride to the mall,

PROPOSED FINDINGS
PAGE -3-

which Vassar refused;  2) she accidentally hit his car but she did not dent it;  3) Vassar became angry and hit her in the head by grabbing her through the open driver's door window;  4) additionally, Bostic got out of the car and Vassar hit her again, and then Vassar shook their son Johnson;  5) finally, Robinson came to break it up and her son left to call police;  6) Vassar and Robinson fled the scene and she followed Vassar in her car until Vassar ran a red light and wrecked his car.

Officer Martin interviewed Johnson who described the events as follows: 1) his dad picked him up; 2) his mom got mad and flung open her car door; 3) Vassar hit his mom; 4) he yelled at his dad; 5) his dad hit him twice, and he swung at his dad and mom did too; 6) his mom told him to call the police.  On cross-examination Officer Martin acknowledged that neither Bostic nor Johnson had   visible injuries, though, Bostic was crying when she spoke with Officer Martin.

Officer Marin also interviewed an independent witness, Ms. Melanie Malzhan and based in part on her statement, he cited Vassar.  After cross-examination and on re-direct, Officer Martin clarified that Malzhan wrote her own statement and gave it to Officer Martin.

The Government's third witness, Melanie Malzhan testified that she heard the argument between Vassar and Bostic while she was standing on her balcony facing the street, approximately 20 to 30 feet from the cars.  She identified Vassar in court as the male she saw and that she already recognized Johnson as a little boy who lived in the neighborhood and played across the street from her home.  She explained that she saw Vassar's hand go through the driver's side window and that it looked like Vassar hit Bostic.  She saw them outside the vehicles hitting each other for about 10 to 15 seconds.  The little boy appeared to her to be yelling at Vassar,"leave my mom, alone."  Then she saw Vassar turn on the kid and strike him. She didn't count how many blows were struck.  Then she saw Bostic jump upon Vassar's back until the passenger Robinson separated everyone.  Then Vassar left the scene with Robinson in the car as passenger.  She saw Bostic follow them.  Malzhan called 911, describing Vassar as having hit Bostic.

On cross-examination, Malzhan admitted she did not see contact on Vassar's  first hit.

PROPOSED FINDINGS
PAGE -4-

1   She also could not be sure if Vassar struck Johnson with a closed or open hand.  She believed

2   that the attack by Vassar on Johnson lasted 5 seconds.

3       The Government called Kenya Bostic as its fourth witness.  She testified that she was a

4   patient care coordinator at Group Health Cooperative.  She identified Vassar as the person who

5   is the father of her son Jerrel Johnson.  On the incident date, she met Vassar outside her

6   apartment and her son got in Vassar's car.  She argued playfully with Vassar as their cars faced

7   one another in the street.  She opened her door which struck his car, and still joking, she opened

8   the car door again.  Vassar jumped out of his car and started calling her names.  Vassar showed

9   her the location of a dent she purportedly caused and she denied seeing the dent. Parenthetically,

10  she explained that Vassar told her he bought the car (2005 Acura) and she had driven it.

11      Bostic describes Vassar as still angry when he confronted her at the driver's window while

12  she was in the car.  She recalls he yelled, "You are going to pay for this!"  Then he struck her

13  with his right hand, reaching through the window.  She hit him and he responded by grabbing

14  her collar.  He hit her with his fist. And her son responded,"You are beating up my mom!"

15  Vassar responded hitting their son.  She got out of the car and described her son as 'having lost

16  it!"  Robinson pulled them apart after Vassar struck her son twice with his fists.  Her son also

17  defended himself by hitting back.  Then she told her son to call the police.  She then demanded

18  Vassar talk to her and she pulled on the door handle; however, Vassar and Robinson drove off,

19  leaving Bostic's ring stuck in the door.   She jumped in her car and met with them at a nearby

20  intersection.  As she drove she called 9-1-1.  Bostic admitted running a red light to follow

21  Vassar.  She described to the 9-1-1 operator Vassar's driving as weaving in and out of traffic

22  and ultimately his collision into nearby trees.

23      On cross-examination, Bostic admitted having a temper and that she probably lost it that

24  day.  She admitted a prior misdemeanor convictions for malicious mischief and for discharge of

25

26

27

28

PROPOSED FINDINGS
PAGE -5-

1  a firearm.  She admitted following his car two lengths behind him and that she ran a red light to

2  keep up with him.   The Government rested after Bostic's cross-examination.

3       The defense called Charles Robinson.  Robinson recalled that he and Vassar did not have a

4  prior arrangement to meet on April 14, 2005.  The coincidental meeting occurred while

5  Robinson was waiting at a bus stop to return to Pioneer Fellowship House in downtown Seattle.

6  Vassar told Robinson he had to pick up his son and when they arrived, they learned that Bostic

7  also wanted a ride.  Robinson recalls that Vassar refused and she got an attitude.  She pulled her

8  car close to Vassar's and got out of her car.  She was laughing.  She opened the door, carelessly

9  but on purpose.  Vassar responded with anger and got out of his car.  Robinson did not see

10  Vassar punch Bostic. He saw Vassar's hands pointing at Bostic and very close to her face.

11  Robinson was seated in Vassar's car as a front seat passenger.  Shortly thereafter, Robinson

12  recalls Vassar's son Jerrel 'freaked out."  That began a 'big' confrontation which Robinson later

13  broke up.  He did not see Vassar hit his son, though everyone was throwing punches.  He

14  recalled that Vassar put his hands out to repel attack from his son.  Vassar left with Robinson in

15  the car though Bostic stood in front of it to prevent their leaving.   When Vassar backed up to

16  leave, she followed in her car, driving aggressively.  She ran a red light, though Vassar did not.

17  Finally, he did not review the police report written as his explanation of the events.

18       On cross-examination, Robinson reported his conviction for Bank Fraud and identified

19  Vassar as the  co-defendant on that case.  Other convictions, he explained were for domestic

20  violence crimes.  Robinson described knowing  Vassar since Robinson was ten years old,

21  referring to himself as Vassar's nephew though they were not related.  He acknowledged that he

22  knew he was not to associate with Vassar as a condition of his probation.

23       The 2005 Acura Vassar drove on the day of the incident was Vassar's older son's car.  He

24  knew very little about the car, not knowing when the son got the car.  When Vassar saw

25  Robinson at the  bus stop, he told Vassar that he was in the process of being late (sic) for his

26  return to Pioneer Fellowship House.

27       Regarding the police report taken from Robinson that day, Robinson testified that he told

28

PROPOSED FINDINGS
PAGE -6-

1   the officer that Vassar had pointed his finger at Bostic, despite its absence in the report.  He also

2   described the assault as not involving punching or slapping.

3         The defense also called Vassar to testify that he picked up Robinson in Renton at a bus

4   stop.  When he met Bostic, she asked to go or to follow him to the mall and he said "no."

5   Bostic flung open her door and he saw a dent in the car.  Vassar told her she would pay for the

6   dent and got out of his car.  He got upset because Bostic appeared to act as if he meant nothing

7   to her.  There was name calling and finger pointing that followed.  He admitted getting close to

8   her at her car window, though he did not hit her in the car or attempt to do so.  She grabbed his

9   shirt and he asked her to please leave him alone.  He tried to get away from her and then she

10   screamed and punched him.  His son got out and Vassar pushed him away.  He did not hit his

11   son.  Charles got in between him and Bostic and then Vassar got into his car.  Bostic responded

12   by jumping onto his car and standing in front of it.  As he pulled away she ran along side the car

13   for a few seconds.  She followed him in her car and cutoff another car to do so.  In fleeing from

14   her he lost control of his car.  His hand was injured and  his back was injured.

15         Regarding delinquent restitution payments, Vassar testified that he tried to make payments

16   of $20.00 in June and July, otherwise he has been unable to pay.

17         On cross-examination, Vassar explained that money from his best friend Ron Blair was

18   used to buy his son's car because Vassar had Blair's power of attorney. $200,000 was acquired

19   and 50% percent was spent on business and 30% on Blair's driveway renovation.   The

20   Government's exhibit No. 9, a check, was shown to Vassar who recognized it.  Vassar testified

21   that the check was used to buy his son's car, the Acura.  Exhibit No. 9 reflects an account in the

22   defendant's name.  Vassar explained that the account was set up for his friend Ron Blair.   He

23   also acknowledged that he had not paid restitution for the months of January, February, March

24   or April.

25         Regarding his contact with Charles Robinson, Vassar testified that he got permission from

26   USPO Michael Banks to have contact with his relatives, among whom Vassar counted Robinson

27   as his nephew.

28

PROPOSED FINDINGS
PAGE -7-

1   Concerning the alleged assault, Vassar denied reaching inside the car to hit Bostic, rather

2   he pointed his finger which may have gone inside the car.  His son, who was angry, also left the

3   car and tried to attack him, Vassar explained.  He denied grabbing his son around the neck and

4   said that he had only grabbed his son's hands.    Finally, he recalled that Bostic laughed at him at

5   the scene of the collision, after asking if he was okay.  No rebuttal testimony was proffered after

6   the defense rested.

7

8          RECOMMENDING FINDINGS FOLLOWING AN EVIDENTIARY HEARING

9          Based upon the foregoing, I recommend the Court find that the defendant has violated

10  each of the conditions of his supervised release as alleged; and set the matter for a final hearing.

11         Defendant has been detained pending a final determination by the court.

12         DATED this 29th day of June, 2005.

13                                              /s/ Monica Benton

14                                              _____

15                                              MONICA J. BENTON
                                                United States Magistrate Judge

16  cc:  Sentencing Judge              :      Hon. Ricardo S. Martinez

17       Assistant U.S. Attorney        :      Lawrence Lincoln, Janet Freeman
         Defense Attorney              :      Robert Goldsmith

18       U. S. Probation Officer         :      Michael K. Banks

19

20

21

22

23

24

25

26

27

28

PROPOSED FINDINGS
PAGE -8-